**Rose Marie WHITLEDGE, Legal Representative of Frederick Allen Whitledge, Petitioner,**

v.

**SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.**

No. 88–34V.

United States Claims Court.

Dec. 7, 1989.

Michael R. Hugo, Boston, Mass., for petitioner.

The attorney of record for respondent withdrew his appearance prior to the hearing before the Special Master.

## ORDER [1]

MOODY R. TIDWELL, III, Judge.

Under the National Childhood Vaccine Compensation Program, 42 U.S.C. §§ 300aa–1 to 300aa–33 (Supp.V.1987), this matter comes before the court on the basis of the November 14, 1989 Report and Recommendation of Special Master Denis J. Hauptly.

No objection has been filed to the Special Master's findings nor conclusions of law and the time for filing such an objection has expired.

After reviewing the Special Master's Report and Recommendation, and pursuant to 42 U.S.C. § 300aa–12(d)(2), the court hereby adopts the Special Master's Report and Recommendation in full, including the recommended findings and conclusions of law, and attaches them hereto as if fully reproduced in this order.

Accordingly, the Clerk of the court is directed to enter judgement for petitioner in the amount of $976,341.97 for unreimbursable future expenses, $5,411.25 for reasonable attorneys' fees plus $1,677.00 for paralegal fees, $7,088.25 for reasonable costs, and $15,650.50 for pain and suffering taking into account the statutory limitation.

IT IS SO ORDERED.

## REPORT AND RECOMMENDATION OF JUDGMENT [1]

Filed November 14, 1989

HAUPTLY, Special Master:

### INTRODUCTION

1. This case concerns the eligibility of Frederick Allen Whitledge, (hereinafter Al-

---

1. This order may contain information that may not be disclosed to a nonparty. *See* 42 U.S.C. § 300aa–12 (1987). Accordingly, within fourteen (14) days of the date of this order, the parties shall designate any material subject to section 300aa–12 and such designated material will be deleted for public access. If on review of this order there are no objections filed within the fourteen (14) day period, then it shall be deemed that there is no material subject to section 300aa–12.

1. This report may contain information that may not be disclosed to a nonparty. *See* 42 U.S.C.

len) for compensation under the National Childhood Vaccine Injury Act. Allen is currently 10 years of age and living in Henderson, Kentucky. No hearing was held in this case. The respondent initially participated in this case. However, respondent filed a notice of withdrawal on May 9, 1989 and no other counsel has been assigned to represent the Government.

2. Requirements for Eligibility.

In order for petitioner to succeed in its claim for compensation, she must prove the following statutory requirements.

Section 300aa–13(a)(1) of Vaccine Act provides that compensation shall be awarded to a petitioner if the court finds on the record as a whole—

(A) that the petitioner has demonstrated by a preponderance of the evidence the matters required in the petition by section 300aa–11(c)(1) of this title, and

(B) that there is not a preponderance of the evidence that the illness, disability, injury, condition, or death described in the petition is due to factors unrelated to the administration of the vaccine described in the petition.

In turn, under 300aa–11(c)(1), a petitioner can establish entitlement to an award by demonstrating that the vaccine recipient in question—

(A) received a vaccine set forth in the Vaccine Injury Table ...,

(B) received the vaccine in the United States or in its trust territories,

(C) sustained, or had significantly aggravated, any illness, disability, injury, or condition set forth in the Vaccine Injury Table in association with the vaccine referred to in subparagraph (A) ..., and the first symptom or manifestation of the onset or of the significant aggravation of any such illness, disability, injury, or condition ... occurred within the time period after vaccine administration set forth in the Vaccine Injury Table,

§ 300aa–12 (1987). Accordingly, within fourteen (14) days of the date of filing this report, the parties shall designate any material subject to section 300aa–12 and such designated material will be deleted for public access. If on review of this report, there are no objections filed within the fourteen (14) day period, then it shall

(D)(i) suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine and incurred unreimbursable expenses due in whole or in part to such illness, disability, injury, or condition in amount greater than $1,000, or (ii) died from the administration of the vaccine, and

(E) has not previously collected an award or settlement of a civil action for damages for such vaccine-related injury or death.

3. Reception of Vaccine

The record clearly supports, by a preponderance of the evidence, that Allen received a vaccine listed in the Vaccine Injury Table (The DPT vaccine) on June 26, 1979 and received that vaccine in the United States, thereby satisfying the requirements denoted at 42 U.S.C. § 300aa–11(c)(1)(A) and (B). Petitioners Submission Number 1 (hereinafter P.Sub. No. ___.)

4. Sustained a Compensable Injury Within the Proscribed Time Period.

■ Several hours after Allen received the third in a series of 3 inoculations, Allen's mother, Rose Marie Whitledge, observed that Allen's body and head began to jerk in a seizure-like manner. Mrs. Whitledge further observed that Allen cried and screamed in an unconsolable fashion. *Id.* Mrs. Whitledge contacted the vaccine administrator but was told that Allen's behavior was not unusual and to give Allen tylenol every 4 hours. Within 48 hours of the inoculation Allen's seizure-like behavior worsened and he began to keel over. Mrs. Whitledge again contacted the vaccine administrator to express her concern over this behavior. She was told that Allen was a clumsy baby and that her concerns were groundless.[2] P.Sub No. 17. In the early morning hours of July 19, 1979, Mrs. Whitledge was awakened by Allen who was

be deemed that there is no material subject to section 300aa–12.

**2.** These symptoms correspond to the symptoms cited by the Vaccine Injury Table. *See* 42 U.S.C. § 300aa–14(b)(3)(A).

emitting strange and unusual sounds. Mrs. Whitledge immediately brought Allen to the Community Medical Hospital in Henderson, Kentucky where Allen was diagnosed as suffering generalized seizures. *Id.*[3]

The record in this case was reviewed by petitioner's medical expert, Dr. Marcel Kinsbourne. Dr. Kinsbourne has been qualified as an expert in several vaccine cases. He is a pediatric neurologist with extensive teaching and clinical experience on vaccine injuries. He has also written extensively on the subject. After a thorough review of Allen's medical history and based on his knowledge and experience as a pediatric neurologist, Dr. Kinsbourne has stated that it is his opinion, based upon a reasonable degree of medical certainty, that Allen suffered an encephalopathy and attendant diminution of intellectual capacity that were caused by the third DPT inoculation. P.Sub. No. 31. In order for petitioner to establish entitlement for compensation in an alleged encephalopathy pursuant to an inoculation contained within the Vaccine Injury Table, petitioner must meet certain criteria pursuant to 42 U.S.C. § 300aa–14(b)(3)(A). In that section, entitled Qualifications and Aids to Interpretation, signs and symptoms denoting the existence of an encephalopathy include high pitched and unusual screaming and unconsolable crying with or without convulsions. These symptoms are documented in this case.[4] The undersigned finds that there is a preponderance of evidence that petitioner has met these requirements. P.Sub No's. 17, 25, 31.

It may be that a critical medical evaluation would disclose some other causation of Allen's condition. However, the respondent has chosen not to perform an evaluation or, at least, not to perform it in time for it to be of any use. On the record before me there is a preponderance of the evidence showing that Allen's encephalopathy was caused by the administration of the DPT inoculation.

In addition, the records supplied by petitioner with her petition show unreimbursed expenses of over $1,000, thus meeting the requirement of 42 U.S.C. § 300aa–11(c)(1)(D)(i). P.Sub. No. 17. Further, no prior settlement of a civil action has been collected for Allen's vaccine-related injury. Thus, the requirements of 42 U.S.C. § 300aa–11(c)(1)(E) are satisfied. P.Sub. Nos. 1, 18.

5. Alternative Causation

The record is devoid of evidence that there was some other cause of injuries.

6. Damages

The statute provides that compensation may be awarded in a pre-Act case such as this for "reasonable projected unreimbursable expenses." 42 U.S.C. § 300aa–15(a)(1)(A). The statutory categories of expenses include: diagnosis and medical or other remedial care, rehabilitation, developmental evaluation, special education, vocational training and placement, case management services, counseling, emotional or behavioral therapy, residential and custodial care and services expenses, special equipment, related travel expenses and facilities determined to be reasonably necessary. 42 U.S.C. § 300aa–15(a)(1)(B)(iii).

All costs are based upon an assumption of a life expectancy of 62 years. Petition-

---

**3.** Dr. Kelley W. Fife, a practicing pediatrician who has treated Allen, has diagnosed him as suffering from chronic seizure disorder. It is Dr. Fife's medical opinion that this disorder is a result of the DPT inoculation. *Id.* However, the records show that when Allen was brought to the hospital on July 19, 1979, he may have been suffering from a fever. The medical records contradict each other on this point. P.Sub. No. 7. If one were to assume that this temperature exceeded 102 degrees, then the statutory presumption for causation as to residual seizure disorder would be nullified since causation is not implied under the Vaccine Injury

Table as to residual seizure disorder if such a fever is involved. This issue, however, need not be broached in that the record clearly establishes that in addition to seizure activities, Allen suffered from an encephalopathy and that injury fell well within the parameters of the Vaccine Injury Table's requirements.

**4.** 42 U.S.C. § 300aa–14(b)(3)(A) states that an encephalopathy usually can be documented by slow wave activity on an electroencephalogram. This slow wave activity has been diagnosed and documented in this petition. *See* P.Sub. No. 7, results of EEG testing by Dr. Gerald Fenichel.

er, in determining Allen's life expectancy, has relied on tables prepared and distributed by the United States government in *Vital Statistics of the United States, 1986,* Vol. II Section 6. (PHS) 88–1147. P.Sub No. 17.

The figures recommended below must be adjusted to net present value. *See,* 42 U.S.C. § 300aa–15(f)(4)(A). The methodology proposed in this case was to assume a general rate of inflation of 4% and then apply that rate to the current costs demonstrated for the services and goods needed. From that calculation, a lifetime cost figure is developed based on the petitioner's life expectancy. That figure is given to an annuitist who gives a price for an annuity that would supply that amount of money over the expected life term.

In my view, the methodology proposed here is reasonable and I have adopted it. It would be possible to refine it further. For instance, it is possible to estimate a higher rate of inflation for medical services than is estimated for other items. In my view, elaborate efforts at refining predictions of future economic developments based on past economic trends would not be cost-efficient. In either case it is guesswork. More elaborate guesswork is not better guesswork. It is merely more time-consuming. Given that the method proposed by the petitioner's expert is facially reasonable and its assumptions are conservative I see no reason to propose another method whose likelihood of error is just as great.

Allen's injuries are permanent and he will require constant supervision and medical care for the remainder of his life. P.Sub. No. 25. The life care plan submitted by the petitioner provides services sufficient to enable Allen to remain living at home. *See* 42 U.S.C. § 300aa–15(c). P.Sub. No. 27. Contained in the life care plan is a description of Allen's disabilities. *Id.* at pp. 1–5. Among the various medications that have been prescribed is valium. This medication causes Allen to become hyperactive which in turn causes him to engage in violent, self-destructive behavior. Since the inoculation Allen has been hospi-

talized 55 times due to severe seizures. He has myoclonic seizures at least 10 times per day and grand mal seizures approximately once a week.

Allen's motor functions are severely limited. The risk of a sudden fall is a constant concern. He is virtually unable to clothe, feed or wash himself. He has been tested as having an IQ of 50. The Whitledge's must watch him constantly. The record supports the proposal that Allen will require the services of a registered nurse 12 hours a day, 5 days a week and a certified home health aide for an 8 hour period on the weekends until Mrs. Whitledge reaches the age of 50 in the year 2010. Thereafter, a full-time registered nurse will be required for the remainder of Allen's life. *Id.* at pp. 12–13. I find both of these proposals reasonable.

In addition, Allen will require a panoply of continuing medical needs. In the year 2023 Allen will become eligible for Medicare. In the meanwhile, petitioners' have submitted their insurance premiums and deductibles in the request. *Id.* at p. 11. Had there been a request for lost wages, I would have recommended against inclusion of this item since the provision on lost wages requires deduction of the cost of health insurance. *See* 42 U.S.C. § 300aa–15(a)(3)(B). Where there is no such request, the inclusion of health insurance premiums seems reasonable and appropriate to me and I recommend their inclusion.

Other costs prayed for include medical supplies and treatment, wheelchair costs, and personal care and comfort equipment reasonably related to Allen's condition.

A request for architectural modifications to the existing structure has also been submitted. I have reviewed the request for additions and renovations and find them, for the most part, reasonable and necessary. These one time costs include a bathroom designed for Allen's special needs. A concrete wheelchair ramp and a hydraulic lift is required to make the back door accessible. Additionally, structural modification of his bedroom so as to accommodate handicapped accessible equipment and a sepa-

rate room in close proximity to Allen's sleeping quarters to house a live-in nurse will be required.[5]  P.Sub. No. 27 at 16–19.

■ Requests for costs unrelated to Allen's disabilities are not, however, allowable.  42 U.S.C. § 300aa–15(a).  The life care plan submitted contains requests for, amongst other things, assistance with mortgage payments, lawn care, snow removal and food.  P.Sub. No. 27 at 19. These costs are not the result of and are not related to Allen's injuries.  This also applies to the request for annual payments related to certain entertainment expenses. *Id.* at 16.  Accordingly, the annual costs requested for entertainment expenses, multiplied by Allen's projected life expectancy of 62 years along with the disallowed housing requests which were projected to commence when Allen reaches the age of 18 shall be disallowed.  The total amount requested, before the figure is reduced to present value, is $7,973,908.  When one subtracts the costs for the disallowed requests in the amount of $233,100, the total figure is reduced to $7,740,808.

9.  Total Costs and Recommended Award.

■ The total one-time costs for architectural-renovation, dental treatment, electrical upgrading, hydraulic systems and other necessary equipment equal $71,235.

The total recurring costs requested equals $7,902,673.  I have allowed $7,740,808.  Extrapolating from petitioner's methodology by taking her total recurring costs figure of $7,902,673, dividing it into the $7,740,808, proposed above and taking the resulting fraction (.98) and multiplying it by the present value figure supplied for the higher number ($924,050), the net current value for the recurring costs is $905,106.97.

When the total one-time costs and total recurring costs reduced to net current value are added together, the net proposed award is $976,341.97.

10.  Attorneys' Fees and Costs.

In pre-Act cases the statute limits attorneys' fees, costs and pain and suffering to a maximum of $30,000.  *See* 42 U.S.C. § 300aa–15(b) and the opinion in *Mikulich v. Secretary of Dept. of Health and Human Services,* 18 Cl.Ct. 253, 258 (Cl.Ct., June 30, 1989).  This court has determined that the appropriate method for computation of attorneys' fees awarded under the Act is to be based upon the "lodestar" model approach.  *See Gregson v. Secretary of the Dept. of Health and Human Services,* No. 88–1V, Slip Op. at 7 (Cl.Ct., April 24, 1989).  The lodestar is the product of the reasonable hours expended multiplied by a reasonable hourly rate.  The resulting figure is presumed to be a reasonable fee to which the petitioning attorney is entitled.  *Hensley v. Eckerhart,* 461 U.S. 424, 434, 103 S.Ct.1933, 1939, 76 L.Ed.2d 40 (1983).  The reasonable hourly rate is "the prevailing market rates in the relevant community" for similar services by lawyers of comparable skill, experience, and reputation.  *Blum v. Stenson,* 465 U.S. 886, 896, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984).

In calculating the number of reasonable hours, those hours which reflect "excessive, redundant, otherwise unnecessary" hours are excluded from the compensable number of hours.  *Hensley,* 461 U.S. at 434, 103 S.Ct. at 1939.

As has been discussed in other opinions, (*Mikulich,* 88–2V, *Slip Op.* at 10) the statute limits compensation for lost wages, pain and suffering and attorneys' fees and costs to a total of $30,000.  *See* 42 U.S.C. § 300aa–15(b).  It is obvious that this statutory limitation creates a difficult dilemma. In many of the petitions filed in this court pain and suffering alone can reasonably be said to amount to more than $30,000.  It is also equally clear that in certain prayers for relief, lost wages could also exceed that sum.

On the other hand, if attorneys' fees and costs are awarded first, the pool for pain and suffering and lost wages will be significantly diminished if not wiped out entirely.

For counsel to choose between the entitlement of their client and their fees creates an intolerable ethical conflict which counsel cannot properly resolve.

---

5.  Since a live-in nurse will not be needed for some years, this cost could be deferred instead of being included in the initial payments.  However, it is not clear that it would be more expensive to build now in conjunction with other renovation than to defer this item.

The choice then is between underpaying or not paying counsel, on the one hand, and undercompensating the petitioner where the statute already limits petitioner to an amount short of full compensation, on the other hand. The choice should be made on the basis of which horn of the dilemma does the least harm to Congressional intent.

■ It seems clear to me that in permitting awards of attorneys' fees, barring counsel from collecting directly from the client 42 U.S.C. § 300aa–15(e)(3), and limiting the sum to one which would in many cases be too low, Congress must have intended that the fees and costs be paid first. The attorneys' fees provision is obviously intended to provide an incentive to counsel to take these cases. The choice of compensating counsel first, then, seems consistent with the intent of Congress. While undercompensation of petitioner in the capped areas is not pleasant, it is already contemplated by the statute's limitation. Thus, awarding the attorneys' fees first would not appear to violate Congressional intent in this area.

Since I conclude that the sum available for pain and suffering and lost wages is equal to the sum of $30,000 minus those amounts recommended for reasonable attorneys' fees and costs, my proposed findings will include the amount left over after fees and costs.

The attorneys in this case have asked for an hourly rate of $275 per hour for 24.05 hours and paralegal fees of $65.00 per hour for 25.80 hours. These fees are supported by an affidavit from an experienced practitioner in the area in which they practice and in a related type of practice. While it is clear that the number of attorney hours submitted are reasonable, and that duplicative hours have been carefully avoided, in balance, and especially considering that respondent played no role in this case, I recommend an hourly rate of $225. The total fees then are $5,411.25 for attorneys' fees and $1,677 for paralegal services. The costs requested amount to $7,260.98. The costs are documented and reasonable. I recommend that they be allowed.

In determining the reasonableness of these proposed rates two competing factors are particularly relevant to this case. Unlike typical tort litigation, these cases carry a low risk factor, at last as far as counsel is concerned. Even when no compensation is awarded to the petitioner, counsel may receive fees and costs. 42 U.S.C. § 300aa–15(e). On the other hand, the lack of risk is a formalism. This is a new program. It presents new and novel questions. It is a program which has had some rocky moments legislatively and administratively. Counsel involving themselves at the outset, before the dust has settled, face considerable uncertainty. They also, through their efforts, can be of considerable assistance to the court.

11. Proposed Findings.

1. Frederick Allen Whitledge received a vaccine listed on the Vaccine Injury Table on June 26, 1979 in the United States of America.

2. That within 72 hours thereafter Allen developed an encephalopathy that he has suffered from the consequences of the disorder for more than one year and continues to suffer from them.

3. The disorder is progressive and debilitating and has led to substantial disability.

4. Unreimbursed expenditures in connection with this disorder have exceeded $1,000.

5. There is not a preponderance of the evidence to support any alternative causation of this disorder.

6. There are no civil actions pending and no prior recovery has been had in relation to this disorder.

7. Frederick Allen Whitledge will have unreimbursable future expenses reduced to net present value in the amount of $976,341.97.

8. Reasonable attorneys' fees amount to $5,411.25 plus $1,677.00 in paralegal fees. Reasonable costs amount to $7,088.25.

9. Taking into account the statutory limitation, an award of $15,650.50 for pain and suffering should be awarded.